FILED & JUDGMENT ENTERED
Steven T. Salata

December 6 2016

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T Beyer_
Laura T. Beyer
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **PCH OPERATIONS, LLC,** | ) | Chapter 7 |
| | ) | Case No.: 09-50697 |
| Debtor. | ) | |
| _____ ) | ) | |
| | ) | |
| | ) | |
| **BARRETT L. CRAWFORD, Trustee** | ) | |
| **for the Bankruptcy Estate of** | ) | |
| **PCH Operations, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 10-05067 |
| | ) | |
| **PATRICK HOSPITAL INVESTORS,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **PATRICK HOSPITAL, LLC,** | ) | |
| | ) | |
| **CHARLES E. TREFZGER, JR.,** | ) | |
| | ) | |
| **DAVID S. JONES,** | ) | |
| | ) | |
| **REGINALD MOORE, JR.,** | ) | |
| | ) | |
| **JOHN KESSEL,** | ) | |
| | ) | |
| **and GREG ROSENFELD,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ ) | ) | |
| | ) | |
| | ) | |

| | |
|---|---|
| BARRETT L. CRAWFORD, Trustee for the Bankruptcy Estate of PCH Operations, LLC,<br><br>            Plaintiff,<br><br>v.<br><br>PATRICK HOSPITAL INVESTORS, LLC,<br><br>PATRICK HOSPITAL, LLC,<br><br>CHARLES E. TREFZGER, JR.,<br><br>and DAVID S. JONES,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adversary Proceeding<br>No. 11-05023 |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT IN ADVERSARY PROCEEDING NOS. 10-05067 AND 11-05023**

**THIS MATTER** is before the court on the Defendants' Motion for Summary Judgment filed in adversary proceeding no. 10-05067 (the "2010 Motion") and the Defendants' Motion for Summary Judgment filed in adversary proceeding no. 11-05023 (the "2011 Motion") (collectively, the "Motions"). As will be discussed, summary judgment is granted as to the claims under 11 U.S.C. §§ 544, 548, and 549; the claim for obstruction of justice; the claims under the North Carolina Uniform Fraudulent Transfer Act ("NC UFTA") and N.C. GEN. STAT. § 75; and the claim for successor in interest. Summary judgment is denied as to the preference claim under § 547; the claims for negligence, conversion, bailment, and breach of fiduciary duty; the claims under §§ 506(c) and 510; and the claims for accounting and unjust enrichment. Partial summary judgment is granted as to

2

the claims under § 550 and the claim for suretyship contribution.

## I. Background

## A. Procedural Background

The Trustee filed his Complaint in case no. 10-05067 on September 2, 2010 and his Amended Complaint on October 1, 2010 (the "2010 Complaint") against Patrick Hospital Investors, LLC ("PHI"), a North Carolina limited liability corporation; Patrick Hospital, LLC ("PH LLC"), a North Carolina limited liability corporation;[1] Charles E. Trefzger, Jr.; David S. Jones; Reginald Moore, Jr.; John Kessel; and Greg Rosenfeld (collectively, the "2010 Defendants"). The Trustee asserted the following claims in the 2010 Complaint: declaratory relief;[2] contribution based on a theory of guaranty and/or suretyship against PHI, Trefzger, Jones, Moore, Kessel, and Rosenfeld (collectively, the "Suretyship Defendants"); accounting and conversion against PHI, PH LLC, Trefzger, and Jones; avoidance of transfer under § 548 against PH LLC, Trefzger, and Jones; avoidance of transfer under § 547;[3] recovery under § 550 against PHI, PH LLC, Trefzger, and

---

[1] While the 2010 Complaint and 2011 Complaint both assert that PHI and PH LLC were incorporated in Virginia, the Defendants have maintained in their answers to both complaints that PHI and PH LLC were incorporated in North Carolina. Despite the discrepancy in the pleadings, it appears from the record before the court that PHI was incorporated in North Carolina, Exhibit B of 2011 Motion, Doc. No. 24-1 (B-1) at 5, and so was PH LLC, Deposition of Paul R. Ekholm, no. 11-05023, Doc. No. 28-5 at 24.

[2] In addition to the 2010 Defendants, the 2010 Complaint listed Presidium Asset Solutions ("PAS") and Wachovia Bank ("Wachovia") as defendants, but the claims against those defendants were dismissed on July 28, 2011. PAS and Wachovia were the only defendants named in the 2010 Complaint's claim for declaratory relief, so that claim will be treated as dismissed.

[3] The Trustee did not specify the defendants in regard to the § 547 claim in the 2010 Complaint. However, the 2010 Motion says the defendants for this claim are PH LLC, Trefzger, and Jones.

Jones; and surcharge of collateral under § 506(c).

The Trustee filed his Complaint in case no. 11-05023 on May 19, 2011 ("2011 Complaint"). Like the 2010 Complaint, the 2011 Complaint asserts claims under §§ 547, 548, and 550 along with claims under state law for accounting and conversion against PHI, PH LLC, Trefzger, and Jones (collectively, the "2011 Defendants"). The 2011 Complaint also includes the following additional claims under Title 11: avoidance of rights and interests under § 544 against the 2011 Defendants; avoidance of post-petition transfers under § 549 against the 2011 Defendants; and a claim under § 510 for the subordination of PHI's claim. Further, the 2011 Complaint raises a number of additional state law claims. As to all the 2011 Defendants, the 2011 Complaint raises claims for: avoidance of transfer under the NC UFTA; negligence; breach of fiduciary duty; breach of bailment; obstruction of justice; unjust enrichment; and unfair and deceptive trade practices under N.C. Gen. Stat. § 75. In the claim titled "Successor in Interest," the Trustee alleges that PH LLC "was a mere continuation" of the Debtor, and the transfer of operations to PH LLC "amounts to a de facto merger." 2011 Complaint at 12. [4]

---

[4] Although mere continuation and de facto merger are "generally treated identically," they are separate claims. See Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 464–65 (3d Cir. 2006) (" 'Mere continuation' analysis focuses on whether the new corporation is merely a restructured form of the old, while _de facto_ merger analysis inquires whether a transaction—though structured as an asset purchase—factually amounts to a consolidation or merger.") (citation omitted). Based on the language of the 2011 Complaint, the court cannot tell if the Trustee is asserting a claim for de facto merger,

Case nos. 10-05067 and 11-05023 were consolidated on November 28, 2011 and November 23, 2011, respectively. The discovery deadline expired on March 31, 2012, and the dispositive motion deadline expired on August 10, 2012. The Defendants filed the Motions on August 8, 2012, and the Trustee filed his Response to Defendants' Motion for Summary Judgment ("Response"), no. 11-05023, Doc. No. 34, on August 24, 2012. The court conducted a hearing on the Motion on September 7, 2012 (the "Motion Hearing") and took the matters presented under advisement.

## B. Facts

### 1. Uncontested Facts

The Debtor is a limited liability company incorporated under the laws of North Carolina, Exhibit B of 2011 Motion, Doc. No. 24-1 (B-1) ("Consulting Agreement") at 5, whose principals include M. Eugene Woodward, Jr. and Steven D. Womack, Declaration of M. Eugene Woodward, Jr., no. 11-05023, Doc. No. 29 at 1; Declaration of Steven D. Womack, no. 11-05023, Doc. No. 30 at 1 (combined as "Woodward/Womack Dec.").[5] The Debtor was involved with the acquisition and operation of a hospital facility located in Patrick County, Virginia known as Patrick County Hospital and also known as R.J. Reynolds Hospital (the

---

mere continuation, or both. Yet, the subsequent argumentation from the parties touches on both claims, so the court's analysis will address both de facto merger and mere continuation.

[5] Woodward and Womack make the same assertions in the same places in their respective declarations, so the court will use a combined citation for their declarations.

"Hospital").  2011 Complaint at 2; Answer to Complaint, no. 11-05023, Doc. No. 6 ("2011 Answer") at 2.  The Debtor's involvement with the Hospital would ultimately give rise to its bankruptcy case as well as these two adversary proceedings.

## a. The PHI Loan Agreement

On or around January 10, 2005, PHI purchased the Hospital with a $2,000,000.00 loan from Marshall Investments Corporation ("Marshall") (this loan is hereafter referred to as the "PHI Loan" or the "PHI Loan Agreement").  Exhibit B of 2011 Motion, Doc. No. 24-1 (B-1) ("Promissory Note") at 16; Exhibit A of Motion for Relief from Stay, no. 09-50697, Doc. No. 107-1 ("Loan Agreement")[6] (A-1) at 1.  At the time of the PHI Loan, PHI was owned by Trefzger, Jones, Moore, Kessel, and Rosenfeld.  Response at 1; Exhibit C of 2011 Motion, Doc. No. 24-3 (C-1) ("Jones Depo.") at 9—10.[7]  Although PHI and Marshall were respectively listed as the debtor and creditor in the PHI Loan Agreement, the Debtor's participation as a lessee of the Hospital was contemplated as part of the PHI Loan financing, Loan Agreement, Doc. No. 107-1 (A-1) at 12.  Accordingly, contemporaneous with the PHI Loan, the Debtor agreed to lease the Hospital from PHI, and the rent under the Lease Agreement was the greater of

---

[6] The Loan Agreement was not formally tendered in conjunction with the Motion Hearing or filed in either adversary proceeding.  However, the Loan Agreement and Promissory Note refer to one another, and the Loan Agreement appears to have been a relevant document for the PHI Loan.
[7] In his deposition, Jones stated that he transferred his stake in PHI to Trefzger at some point after the PHI Loan.  Jones Depo. at 9—10.  However, the Trustee alleges that Trefzger, Jones, Moore, Kessell, and Rosenfeld all still have an ownership interest in PHI.  Response at 1.

$20,000.00 or PHI's monthly loan payment to Marshall.  Exhibit B of 2011 Motion, Doc. No. 24-2 (B-2) (the "Lease Agreement") at 1—2.

In exchange for its financing, Marshall received a security interest in the Hospital's real and personal property, 2011 Complaint at 2; 2011 Answer at 2, and the following individuals signed a "Guaranty of Payment and Performance"[8] (collectively, the "Guaranty Agreements") in favor of Marshall: Trefzger, Jones, Moore, Kessel, and Rosenfeld (collectively, the "Individual Guarantors").  All of the Individual Guarantors agreed to be liable to the full extent of PHI's obligations under the PHI Loan.  Guarantee Agreement at 1—2.  In addition, the Debtor pledged its assets as security for the PHI Loan with an Assignment and Security Agreement.  Exhibit B of Motion to Dismiss, no. 10-05067, Doc. No. 21-2 ("Security Agreement") at 15—16.  The Security Agreement made the Debtor liable to the full extent of PHI's obligations under the PHI Loan, and the Security Agreement further provides that a payment default under the Lease Agreement would also count as a default as to Marshall. Security Agreement at 16—17.  The PHI Loan Agreement, Guaranty Agreements, Lease Agreement, and Security Agreement all provide that they would be governed by Virginia law.  Promissory Note at

---

[8] The first page of the Guarantee Agreements for the respective Individual Guarantors may be found in case no. 10-05067, Doc. No. 21-1, as follows: Moore at 1; Rosenfeld at 10; Trefzger at 19; Jones at 28; and Kessel at 37. Although they are technically separate documents, the respective Guaranty Agreements all include the same substantive language, so for purposes of readability and convenience, citations to the Guaranty Agreements will just refer to the Guaranty Agreement for Moore.

21; Loan Agreement, Doc. No. 107-2 (A-2) at 17—18; Guaranty Agreement at 7; Lease Agreement at 13; Security Agreement at 20.

**b. Fallout at the Hospital**

The parties contemplated that PHI would own the Hospital while the Debtor operated it, and this arrangement initially went smoothly. 2011 Motion at 3. However, the parties never reached an explicit agreement as to who should be primarily responsible for the PHI Loan payments, Response at 2, and there was ultimately a fallout at the Hospital. Although the parties disagree as to the allocation of blame for the fallout, there are some key events they agree upon.

In March of 2008, the Debtor and PHI entered into a Consulting Agreement. Exhibit B of 2011 Motion, Doc. No. 24-1 (B-1) ("Consulting Agreement") at 5. The Consulting Agreement provides that PHI would act as a consultant to the Debtor while the parties worked toward a transition agreement where the Debtor would relinquish control of the Hospital to PHI, thereby terminating the Lease Agreement. Consulting Agreement at 5—6. However, the contemplated transition agreement never came to fruition.

In October of 2008, Pharmacy Healthcare obtained a judgment against the Debtor and began garnishing the Debtor's bank accounts. 2010 Motion at 4; Exhibit B of 2010 Motion, Doc. No. 54-1 at 61—62. Subsequently, Jones and Trefzger formed PH LLC, and PH LLC began operating the Hospital, 2011 Motion at 4. The

Debtor, in turn, filed an action in Virginia state court against PHI and others in November of 2008 seeking the recovery of its books, records, accounts, and other property.  Response at 4. Yet, the Debtor never again operated the Hospital, and it filed a voluntary petition under Chapter 7 of the Bankruptcy Code on May 20, 2009.

In September or October of 2009, without providing notice to the Trustee, PHI and Marshall agreed to the sale of the Hospital where Marshall would relinquish its security interest in the Hospital without receiving full payment of the underlying debt (this transaction is hereafter referred to as the "Hospital Sale").  2011 Complaint at 4—5; 2011 Answer at 5.  Eventually, the Trustee reached a settlement agreement with Presidium Asset Solutions ("PAS"), the successor in interest to Marshall, that satisfied the underlying debt associated with the PHI Loan.  The Trustee obtained an Order for Turnover in the base bankruptcy case on May 10, 2010 that directed PH LLC to turn over any books and records in its possession that were property of the Debtor.

## 3. Disputed Facts and Circumstances

### a. Position of the Trustee

According to the Trustee, the Debtor was ousted from the Hospital through a self-help eviction orchestrated by Trefzger and Jones under the auspices of PHI.  Response at 4.  At the time of the eviction, the Trustee maintains that the Debtor was no more than two months behind on its rent, but the Debtor was

nevertheless sent an eviction notice that instructed its right to possess the Hospital was terminated along with the Consulting Agreement. _Id._   Thereafter, Trefzger and Jones operated the Hospital through PH LLC with the Debtor's property while also denying the Debtor access to the Hospital. _Id._ at 4—5.   In addition to the state court action, the Debtor sent a letter to Jones in January of 2009 requesting its books and records, but the Trustee contends that the Debtor was not afforded a reasonable opportunity to retrieve its books, records, and other property after the eviction. _Id._ at 4, 6.

The Trustee alleges that the 2011 Defendants collected receivables owed to the Debtor and made certain transfers while they were in control of the Hospital based on the following observations.   Prior to the eviction, Jones and Trefzger exercised control over the Debtor's day-to-day operations, and Jones and a member of his team of professionals directed the issuance of certain checks and wire transfers from the Debtor's accounts. _Id._ at 3.   After the eviction, there was e-mail correspondence[9] among Jones, Trefzger, and PHI's employees as to how funds should be collected for services rendered before the Debtor ceased operating the Hospital. _Id._ at 5.   In addition, PH LLC issued a post-petition invoice (the "Invoice") in its name that appears to be requesting payment for an account owed prior to the eviction.   Exhibit A to Response, Doc. No. 34-1.

---

[9] Deposition of Paul R. Ekholm, no. 11-05023, Doc. No. 28-5 at 2—7, Doc. No. 28-6 at 28—29, 32—34.

The Trustee asserts that the Debtor's average collection on accounts receivable was between $600,000.00 to $700,00.00 per month prior to the alleged eviction, and the post-eviction collections were significantly reduced. Response at 5—6. The Debtor's Schedule B listed $1,000,000.00 owed for accounts receivable, and the Trustee says he has only been able to recover less than one-half that amount. Id. The Trustee also notes that, based on the Debtor's Statement of Financial Affairs ("SOFA"), the Debtor paid $260,000.00[10] to PHI in the year prior to the Debtor's bankruptcy. 2011 Complaint at 4.

Similar to the Hospital Sale, the Trustee says he was not provided notice of a transaction where Smith/Packet[11] acquired certain bed licenses from PHI in the fall of 2009 (this transaction is hereafter referred to as the "Bed License Agreement"). 2011 Complaint at 5. Smith/Packet paid $125,000.00 for the bed licenses, but the Trustee claims that Smith/Packet had previously offered $250,000.00 pursuant to a letter dated December 26, 2006, Exhibit D of 2011 Complaint, Doc. No. 1-4. As was the case with the Hospital Sale, Marshall released its security interest in the bed licenses without receiving full payment on the PHI Loan. 2011 Complaint at 5. The Trustee surmises that PHI and the Individual Guarantors

---

[10]  The SOFA actually lists $160,000.00 as being paid to PHI.  However, both the Trustee and the Defendants have consistently referred to this amount as $260,000.00.
[11]  In the Complaints, the Trustee says "Smith/Packet" acquired the bed licenses.  In their respective answers, the Defendants say "Smith Packet Med Com, LLC" purchased the bed licenses.  Despite the discrepancy, it appears that the parties are referring to the same entity.

deliberately kept the Trustee in the dark in regard to the short sale of the Hospital and bed licenses as a way to pin their respective liability on the bankruptcy estate.

**b. Position of the Defendants**

In contrast to the Trustee, the Defendants maintain that the Debtor abandoned the Hospital after being in substantial default under the Lease Agreement, 2011 Motion at 4, leaving the Defendants to pick up the pieces. While the Defendants admit to managing the Hospital, they say their management was necessary to ensure that patients were cared for and employees were paid. Id. at 18. The Defendants say they do not know what became of the Debtor's books, records, and other property, but they say the Debtor is to blame for their loss because it abandoned its property along with the Hospital. Id. at 11. The Defendants similarly deny that the Debtor was not afforded a reasonable opportunity to retrieve its property after leaving the Hospital. Id.

In regard to the Debtor's receivables, the 2011 Defendants acknowledge they collected amounts owed to the Debtor. 2011 Answer 3—4. However, the 2011 Defendants maintain that they only did this due to software constraints, and they assert that they took great pains to insure that monies owed to the Debtor were forwarded to the Debtor. Id. In regard to the alleged pre-petition payments of $260,000.00, the 2011 Defendants deny receiving payments from the Debtor other than normal rent

payments to the extent they were tendered.  2011 Motion at 8—9.

The Defendants admit that Marshall consented to the Hospital Sale and Bed License Agreement without receiving full payment for the PHI Loan.  2011 Answer at 5—6.  However, the Defendants assert that they did not need to provide notice of the Hospital Sale or the Bed License Agreement to the Trustee because the respective transactions did not concern property of the estate.  Id.  The Defendants also deny that Smith/Packet made a concrete offer of $250,000.00 for the bed licenses.  Id. Instead, the Defendants explain that the $250,000.00 figure was quoted almost three years before the Bed License Agreement closed and prior to Smith/Packet conducting a due diligence investigation.  Id.

## II. Standard for Summary Judgment

A party moving for summary judgment is entitled to such relief if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56 ("Rule 56").[12]  A summary judgment movant bears the initial burden of showing the absence of a genuine issue of material fact based on " 'the pleadings, depositions, answers to interrogatories, admissions,' " and other documents on file. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting prior version of Rule 56).  If there are no issues of material fact, a Rule 56 movant is entitled to judgment as a matter of

---

[12] FED. R. BANKR. P. 7056 makes the provisions for summary judgment in FED. R. CIV. P. 56 generally applicable in bankruptcy adversary proceedings.

law if a reasonable jury could not render a verdict in favor of the opposing party.  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 252 (1986).  Once a Rule 56 movant has met his burden, the nonmoving party must "designate 'specific facts' " in the record that show there is a " 'genuine issue for trial.' " _Celotex_, 477 U.S. at 324 (quoting prior version of Rule 56).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  _Id._ at 323—24.  With this in mind, summary judgment should be entered against a party who bears the burden of proof at trial when that party fails to point to a specific fact in the record that establishes "the existence of an element essential to [her] case."  _Id._ at 322.  "In such a situation," the Rule 56 movant is entitled to summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  _Id._ at 322—23.

**III. Claims for Avoidance and Recovery under Title 11**

**A. Claim under § 544**

In the 2011 Complaint, the Trustee said he had the right to avoid any interest the 2011 Defendants claimed on property of the bankruptcy estate under § 544.  Yet, in his discovery responses, the Trustee stated that the claim under § 544 was only asserted to the extent the 2011 Defendants were claiming a lien against property of the estate.  The Trustee also

14

acknowledged in his discovery responses that there would be no lien to avoid under § 544 if the 2011 Defendants were not asserting a lien against property of the estate.   The 2011 Defendants confirmed they were not asserting any liens against property of the estate at the Motion Hearing.   Accordingly, summary judgment is granted as to the claim under § 544 due to the fact that there is no asserted lien to avoid.

**B. Claims under § 548 and § 549**

The 2011 Defendants noted that the Complaints alleged that certain "Transfers" occurred, but no further specification is given, and "Transfers" is not otherwise defined.   In interrogatories posed to the Trustee, the 2011 Defendants asked the Trustee to identify any transfer that occurred for the causes of action under § 548 and § 549.   In response, the Trustee did not identify any specific transfer; instead, he generally alleged that the Defendants possessed the Debtor's books, records, and other property, and he reserved the right to amend his interrogatory response.   Exhibit D of 2011 Motion, Doc. No. 24-4 at 48—49.   The Trustee has not amended his interrogatory response, and, now that the discovery period has ended, the 2011 Defendants contend that the Trustee's response should operate as an admission that he cannot establish the occurrence of a specific transfer, an essential element of the claims under § 548 and § 549.

Consistent with his discovery responses, the Trustee

contends that he has not identified a transfer because he has not been able to recover the Debtor's books and records despite repeated requests for their turnover. The Trustee further maintains that the circumstances surrounding the 2011 Defendants' management of the Hospital and the missing receivables indicate that they were responsible for transfers. Based on these implications from the record, the Trustee says it would be unfair for the 2011 Defendants to benefit from his inability to identify a transfer when they were the last people to control the Debtor's books and records. At the very least, the Trustee feels that the parties' disagreement as to what happened to the Debtor's books and records creates a material dispute of fact.

As the description for the cause of action suggests, every basis for the avoidance of a fraudulent transfer under § 548 requires that the claimant prove the existence of a specific transfer.[13] Similarly, the avoidance of a post-petition transfer under § 549 also requires that the plaintiff establish the presence of a transfer. Accordingly, a defendant will be entitled to summary judgment if the plaintiff cannot show the presence of a specific transfer in a claim under § 548 or § 549.

The 2011 Defendants' assertions in regard to the Trustee's interrogatory responses show that the Trustee has not been able

---

[13] For example, the United States Bankruptcy Court for the District of Delaware observed that a claimant did not state a claim for actual fraud or constructive fraud because the claimant "[did] not specify" who received a "particular transfer," "[did] not allege which transfers [were] avoidable or the date of the transfers," and "did not allege the purported value received in exchange for the transfers." Miller v. McCown De Leeuw & Co. (In re The Brown Schs.), 368 B.R. 394, 403–04 (Bankr. D. Del. 2007).

to adequately support an essential element for his claims under § 548 and § 549. The Trustee, therefore, must go beyond his bare assertions and point to a specific transfer in the record for these claims to survive summary judgment. At best, the Trustee's explanation shows the presence of a theoretical transfer based on implications from the record. However, proof of a theoretical transfer is insufficient for the § 548 and § 549 claims to survive summary judgment. Discovery has ended, so the time for the Trustee to designate a specific transfer in the record has expired. As a result, summary judgment is appropriate because the Trustee has failed to establish an essential element for the § 548 and § 549 claims.

## C. Claim under § 547

Similar to the argument posed for the § 548 and § 549 claims, the crux of the 2011 Defendants' argument for summary judgment for the § 547 claim is that the Trustee has not been able to identify a specific transfer in the record. The 2011 Defendants acknowledge that PHI received rent payments, and the 2011 Motion lists payments received from May to August of 2008. 2011 Motion at 8—9. However, the 2011 Motion insisted that the 2011 Defendants are not insiders of the Debtor and that the rent payments were made outside of the ninety-day window for a non-insider preference under § 547(b). Since the Trustee has not identified any transfers that occurred within ninety days, the 2011 Motion concluded that the Trustee cannot satisfy § 547(b).

The 2011 Defendants also argue that, even if the elements of § 547(b) were established, the payments were all for past-due rent, so the payments would be covered by the new value exception under § 547(c)(4).  Id.  At the Motion Hearing, counsel for the 2011 Defendants admitted that the issue of whether they were insiders of the Debtor was appropriate for trial, but he still maintained that whatever payments were received would be covered by the new value exception.

In contrast to the claims under § 548 and § 549, the Trustee has pointed to a preferential transfer that could be covered by § 547(b), namely the payment to PHI listed in the Debtor's SOFA.  In addition, the 2011 Defendants admit that the Debtor made payments to PHI from May to August of 2008.  The 2011 Defendants assert that any payments received would be covered by the new value exception, but the parties' respective accounts differ sharply as to when and how the Debtor left the Hospital, calling into question whether the Debtor actually received new value for these payments.  In sum, there appears to be a reasonable dispute of material fact as to the § 547 claim. As a result, summary judgment is inappropriate, especially considering that the 2011 Defendants bear the burden of proving the new value defense at trial, Hutson v. Greenwich Ins. Co. (In re E-Z Serve Convenience Stores, Inc.), 377 B.R. 491, 498—99 (Bankr. M.D.N.C. 2007) (citing § 547(g)).

**D. Claim under § 550**

Based on the foregoing discussion, summary judgment is appropriate to the extent the Trustee's claim under § 550 is based on the claims under §§ 544, 548, and 549. Summary judgment is not appropriate to the extent the Trustee is asserting the § 547 claim as a basis for recovery under § 550.

**IV. Claims Based on State Law**

**A. Choice of Law**

For claims brought under state law in a bankruptcy adversary proceeding, federal courts apply the choice of law rules of the forum state where the court sits absent a compelling federal interest that dictates otherwise. Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.), 839 F.2d 203, 205—06 (4th Cir. 1988) (citations omitted); TUG Liquidation, LLC v. Atwood (In re Buildnet, Inc.), No. 01-82293 et al., 2004 WL 1534296, at *8, *11 (Bankr. M.D.N.C. June 16, 2004) (citing Merritt Dredging Co. and applying North Carolina choice of law rules). In some cases, federal courts may proceed with a state law claim notwithstanding there being some uncertainty as to which substantive state law should apply. See Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC, 976 F. Supp. 2d 706, 713 n.2 (M.D.N.C. 2013) (noting that it was "unclear" if North Carolina law was applicable, but concluding that the court did not need to address choice of law issues sua sponte because the parties did not contest the application of

North Carolina law).   At the same time, choice of law is not a mere formality, and a court is not compelled to employ non-applicable state law when the parties fail to adequately address the choice of law issue.   See Malinowski v. Lichter Grp., LLC, 165 F. Supp. 3d 328, 336 (D. Md. 2016) (noting that Maryland law "[f]ortunately" provided for a default presumption for choice of law when the parties failed to brief the issue and the record was insufficient for the court to make a sua sponte determination); Synovus Bank v. Coleman, 887 F. Supp. 2d 659, 674 (W.D.N.C. 2012) (ruling that the defendant's counterclaim asserted under South Carolina law had to be dismissed because North Carolina law was applicable).   Ultimately, the claimant assumes the risk of bringing a cause of action under non-applicable state law because it is her burden to prove the claim. See Synovus Bank, 887 F. Supp. 2d at 674; HCI Techs., Inc. v. Avaya, Inc., 446 F. Supp. 2d 518, 523 (E.D. Va. 2006) (noting that the claims under Virginia law were not "likely to succeed" because the contractual choice of law provision made New Jersey law applicable), aff'd, 241 F. App'x 115, 122 n.8, 126 (4th Cir. 2007).

North Carolina choice of law rules will determine which state's substantive law will apply to the respective state law claims in this case, and North Carolina courts base their choice of law determination on the nature of the claim, Synovus Bank, 887 F. Supp. 2d at 668 (citation omitted).   "For contractual

claims, North Carolina courts generally apply the law of the place where the contract was made." Id. (citation omitted). "Further, where the contracting parties have agreed 'that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.' " Id. (quoting Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655 (1980)). For tort claims, North Carolina courts apply the law of the state where the injury occurred, and they consider financial injuries to have occurred " 'where the economic loss was felt.' " Id. at 669 (quoting Clifford v. Am. Int'l Specialty Lines Ins. Co., No. 1:04CV486, 2005 WL 2313907, at *8 (M.D.N.C. Sept. 21, 2005)) ("While the [claimant] is a resident of South Carolina, his alleged pecuniary losses were clearly suffered in North Carolina, as the real estate at issue is located here and the purchase transaction was completed here.").

The relevant facts for the state law claims largely relate to Virginia. The Hospital was located in Virginia, every significant event underlying the claims occurred in Virginia, and the choice of law provisions in all of the relevant contracts and agreements made Virginia law applicable. Thus, Virginia law governs the Trustee's contract and tort claims. Despite the applicability of Virginia law, when the Complaints allege a state law claim, they assert North Carolina law, and the parties' discussion of the state law claims almost

exclusively alludes to North Carolina law. Nevertheless, the court declines to apply North Carolina substantive law to the state law claims based on tort and contract law because it appears that Virginia law is clearly applicable.

**B. Obstruction of Justice, NC UFTA, and N.C. Gen. Stat. § 75 Claims**

The Trustee pled a claim for civil obstruction of justice under North Carolina law, and this claim is a tort law claim under North Carolina law, Swick v. Wilde, No. 1:10-cv-303, 2012 WL 3780350, at *29 (M.D.N.C. Aug. 31, 2012). The situs of the harm is the state of Virginia, and Virginia does not recognize a claim for civil obstruction of justice, Salazar v. U.S. Postal Serv., 929 F. Supp. 966, 969 (E.D. Va. 1996) (citation omitted). Consequently, the Trustee's claim for obstruction of justice fails as a matter of law.

The claims under the NC UFTA and N.C. Gen. Stat. § 75 for unfair and deceptive trade practices were explicitly pled under North Carolina law, but Virginia law is applicable to both of these claims. [14] The Trustee bears the burden of proving his state law claims, and as a result, it is his burden to allege state law claims under the correct state's law. The court, therefore, is left to conclude that summary judgment is

---

[14] The claim under N.C. Gen. Stat. § 75 for unfair and deceptive trade practices is a tort law claim. Piedmont Inst. of Pain Mgmt. v. Staton Found., 157 N.C. Ct. App. 577, 588–89, 581 S.E.2d 68 (2003). Whether a claim under the UFTA is a contract claim or a tort claim is not entirely settled. Sheehan v. Saoud, 650 F. App'x 143, 154 (4th Cir. 2016) (unpublished). Yet, whatever the nature of the UFTA claim, Virginia law controls because the alleged harms, transactions, and relevant choice of law provisions all point to Virginia.

appropriate for the claims under the NC UFTA and N.C. GEN. STAT. § 75 because the court is unable to grant relief under these North Carolina statutes when Virginia law is applicable.

## C. Claims for Negligence, Conversion, Bailment, and Breach of Fiduciary Duty

The 2011 Defendants say they are entitled to summary judgment as to the claims for negligence, conversion,[15] bailment, and breach of fiduciary duty (collectively, the "Breach of Duty Claims") largely due to three conclusions based on the underlying facts.  The first conclusion is that the Debtor abandoned the Hospital and left its property there and the 2011 Defendants only managed the Hospital because the Debtor absconded after being considerably behind on rent.  The second conclusion is that the Debtor was never denied the opportunity to retrieve its property; instead, it simply chose to stand by while the 2011 Defendants managed the Hospital out of necessity. The third conclusion is that the 2011 Defendants never used the property that the Debtor left behind.  Based on these conclusions, the 2011 Defendants assert they owed no duty to the Debtor, and the Breach of Duty Claims fail as a result.

In regard to the 2011 Defendants' first conclusion, Woodward and Womack both contradict the contention that the Debtor abandoned the Hospital, stating in their declarations

---

[15] In the 2010 Complaint, the Trustee asserts what appears to be a claim for accounting and conversion as one combined claim.  However, Moore, Kessel, and Rosenfeld are not named as defendants for this claim in the 2010 Complaint, so the Trustee's claim for conversion is effectively only against the 2011 Defendants.

that the Debtor was ejected from the Hospital through a self-help eviction after only being a month or two behind on rent. Woodward/Womack Dec. at 3. In regard to the 2011 Defendants' second conclusion, Woodward and Womack both maintain that the Debtor was denied access to the Hospital. Id. at 3—4. Furthermore, the state court action filed in November of 2008 serves as evidence that the Debtor did request its books, records, and other personal property, as does the letter the Debtor wrote to Jones in January of 2009 and the motion underlying the May 10, 2010 Order for Turnover.

The third conclusion is contradicted by evidence in the record that shows the 2011 Defendants utilized the Debtor's accounts receivable and other personal property. Prior to the Debtor's eviction, Woodward and Womack attest that PHI, at the direction of Trefzger and Jones, assumed control of the Debtor's day-to-day operations. Id. at 2. Woodward and Womack also assert that Jones and a member of his team of professionals had control over the Debtor's bank accounts before the eviction. Id. at 3. After the eviction, Woodward and Womack say they became aware that the 2011 Defendants were collecting receivables owed to the Debtor prior to the eviction, and they maintain that the collection of the pre-eviction receivables dropped considerably after the 2011 Defendants took over the Hospital. Id. at 4. Also, the Invoice as well as the e-mails between Jones, Trefzger, and PHI's employees serve as evidence that the 2011 Defendants

attempted to collect on receivables that were owed to the Debtor. In regard to the Debtor's other property, Jones admitted in his deposition testimony that the 2011 Defendants "kept operating" the Hospital with the Debtor's property that remained after it left. Jones Depo. at 60.

In sum, the 2011 Defendants' asserted basis for summary judgment for the Breach of Duty Claims is based on their version of events surrounding this case, and the Trustee has presented evidence that contests their characterizations. Accordingly, there is a reasonable dispute as to the material facts underlying the Breach of Duty Claims, making summary judgment inappropriate.

## D. Claims for Successor in Interest

The Defendants say they are entitled to summary judgment for the claims for mere continuation and de facto merger because there was no continuity of ownership between the Debtor and PH LLC. The Defendants concede that PH LLC took over the Debtor's business at the Hospital, but they argue that this does not make PH LLC liable for the Debtor's obligations because PH LLC was only attempting to "salvage the carnage left by the Debtor." 2011 Motion at 17—18. In response, the Trustee says PH LLC is liable for the Debtor's obligations because a third-party observer would not have been able to tell a difference from when either entity operated the Hospital. According to the Trustee, the technical lack of common ownership is overcome by PH LLC's

takeover of the Hospital.

**1. Choice of Law for the Successor in Interest Claims**

Claims for successor liability, like mere continuation and de facto merger, have elements of corporate, tort, and contract law. Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006). Consequently, a court operating under North Carolina choice of law rules may find it difficult to readily ascertain the nature of a claim for mere continuation or de facto merger. The state of incorporation for a corporate entity is relevant under North Carolina choice of law analysis, particularly when the claim deals with " 'matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .' " Angell v. Accugenomics, Inc. (In re Gene Express, Inc.), No. 10-08432-8-JRL, No. 12-00284-8-JRL, 2013 WL 1953344, at *8 (Bankr. E.D.N.C. May 10, 2013) (quoting Haberland v. Bulkeley, 896 F. Supp. 2d 410, 420 (E.D.N.C. 2012)). At the same time, if an entity was incorporated in one jurisdiction, but all other meaningful connections relate to another jurisdiction, then the law of the jurisdiction with more connection to the claim should be applied. Clark v. B.H. Holland Co., 852 F. Supp. 1268, 1272—73 (E.D.N.C. 1994), vacated on other grounds, 86 F.3d 1178 (4th Cir. 1996).

The connection the Trustee's successor in interest claims have to North Carolina begins and ends with the fact that the

Debtor and PH LLC were incorporated there.  These claims do not relate to the internal corporate governance of either the Debtor or PH LLC, and, as already discussed, every other meaningful contact underlying the 2011 Complaint relates to Virginia.  The court, therefore, will apply Virginia law to the mere continuation and de facto merger claims.[16]

## 2. Successor in Interest Claims under Virginia Law

Mere continuation and de facto merger are exceptions[17] to the traditional rule for corporate liability.  Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc., 929 F.2d 691, No. 90-2621 et al., 1991 WL 39457, at *2 (4th Cir. Mar. 26, 1991) (unpublished per curiam) (citations omitted).  "Under the traditional rule, when one company sells or transfers all its assets to another company, the latter is not liable for all the debts and liabilities of the transferor."  Id.  (citations omitted).  If a court finds there has been a mere continuation

---

[16] Both North Carolina law and Virginia law appear to entail substantially the same traditional standards for mere continuation claims.  Compare Lattimore & Assocs. v. Steaksauce, Inc., No. 10 CVS 14744, 2012 WL 1925729, at *6—7 (N.C. Super. Ct. May 25, 2012) (citations omitted) with Blizzard v. Nat'l R.R. Passenger Corp., 831 F. Supp. 544, 548 (E.D. Va. 1993) (citations omitted). Neither state's high court has had occasion to apply the de facto merger doctrine, but this court sees no reason to conclude that the respective supreme courts of North Carolina and Virginia would not apply the commonly accepted standards for de facto merger.  Compare Lattimore & Assocs., 2012 WL 1925729, at *10—11 with Blizzard, 831 F. Supp. at 547—48.  As such, the court would reach the same result in regard to the successor liability claims under North Carolina law as it would under Virginia law.

[17] Most courts recognize the following four exceptions for corporate successor liability: (1) assumption of liabilities by an explicit or implicit agreement; (2) fraud due to a transaction being unlawfully designed to evade creditors; (3) mere continuation; and (4) de facto merger.  Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc., 929 F.2d 691, No. 90-2621 et al., 1991 WL 39457, at *2 (4th Cir. Mar. 26, 1991) (unpublished per curiam). "Inadequate consideration is a fifth exception recognized by some jurisdictions; other jurisdictions treat it as an additional factor to be considered within the above four exceptions."  Id. (citation omitted).

or de facto merger, then the transferee company will be liable for the debts of the transferor company as if they were the same entity.

### a. Mere Continuation

There will be no claim for mere continuation under Virginia law when assets are acquired in a "bona fide, arm's-length transaction." Harris v. T.I., Inc., 243 Va. 63, 70, 413 S.E.2d 605 (1992). Accordingly, a mere continuation claim will only exist if there is reason to doubt that the transaction in question was "bona fide" and "arm's-length." Kaiser Found. Health Plan of the Mid-Atl. States v. Clary & Moore, P.C. ("Kaiser"), 123 F.3d 201, 205, 207 (4th Cir. 1997). At the same time, the absence of an "arm's length bargain" when one corporation acquires another corporation's assets should not be understood to inherently create a mere continuation claim under Virginia law. Taylor v. Atlas Safety Equip. Co., 808 F. Supp. 1246, 1252 (E.D. Va. 1992).

Although there is no "absolute legal standard" for mere continuation, Kaiser, 123 F.3d at 205, the "key element" for a mere continuation claim under Virginia law is whether there is a "common identity of the officers, directors, and stockholders in the selling and purchasing corporations," Harris, 243 Va. at 70 (citations omitted). The Fourth Circuit has interpreted this "key element" as an inquiry into whether the transferor and transferee company have the same ownership. See Kaiser, 123

F.3d at 205 (citing Harris, 413 S.E.2d at 609); see also Taylor,
808 F. Supp. at 1251—52 ("Among these three required factors
(officers, directors, and stockholders), it appears that
identity of ownership is the most important component to sustain
a finding of 'mere continuation.' ") (citations omitted).

Like mere continuation itself, whether there is continuity
of ownership depends on the substance of the underlying
circumstances, not the form.   Kaiser, 123 F.3d at 205—06
(citation omitted).   Bearing this in mind, ownership continuity
may still be sufficient even if the owners of the purchasing and
selling corporations have not always been identical.   For
example, in Kaiser, the Fourth Circuit found that there was
ownership continuity between two law firms despite the fact that
the predecessor firm had a variety of directors over its
lifetime, and the successor firm had one director/owner.   Id.
The Kaiser court found that there was ownership continuity
because: the ownership of the two firms was identical at the
time a large judgment was entered against the predecessor; a
father and son at one point owned almost all of the stock in the
predecessor, and the son owned all the stock of the successor;
the father guaranteed a loan for the successor to purchase
property from the successor; and lastly, all three of the
successor's officers had been officers at the predecessor.   Id.
at 202, 205—06.   In light of the presence of ownership

continuity and other factors,[18] the Kaiser court ruled there was a mere continuation between the two law firms. Id. at 205—09. In reaching this conclusion, the Kaiser court observed that a predecessor corporation under the same control as its successor should not be allowed "to avoid its legitimate debts by manipulating superficial indicia of ownership." Id. at 206.

Although mere continuation looks to substance over form, it is important to note that, in Harris v. T.I., Inc., the Supreme Court of Virginia expressly held that a mere continuation claim failed because the claimant did not allege a "common identity of officers, directors, and stockholders" despite making several assertions that would indicate the presence of a mere continuation.[19] 243 Va. at 70—71. Accordingly, the presence of other factors for mere continuation should not be understood as a replacement for ownership continuity since it is the "key element" for a mere continuation claim under Virginia law.

---

[18] These other considerations were: (i) "whether the new corporation continues in the same business as its predecessor"; (ii) whether the new company uses the same telephone number, address, and office as the old company; (iii) whether adequate consideration was given for the purchase of the assets and whether the transaction was legitimate; and (iv) whether a single corporation remained after the transaction. Kaiser, 123 F.3d at 205 (citations omitted).

[19] Specifically, the claimant in Harris said a mere continuation existed because the successor:

> "acquired all of its predecessor's assets, including the goodwill; undertook essentially the same manufacturing operation as that of its predecessor, and at the same location; held itself out to the world as the ongoing concern of its predecessor; maintained, for a time, essentially the same personnel; made an active effort to maintain the same customers; required its predecessor to cease its ordinary business operation and to liquidate its business as soon as practicable; and assumed some of its predecessor's liabilities."

Harris, 243 Va. at 70.

Similarly, it is doubtful there will be a mere continuation claim under Virginia law when the claim's key element is not present. See id.

Indeed, in an unpublished case involving Virginia law, the Fourth Circuit ruled in Ney v. Landmark Education Corp. that a dispute of fact as to the management of a corporation would still not save a mere continuation claim from a directed verdict when there was no actual ownership continuity. 16 F.3d 410, No. 92-1979, 1994 WL 30973, at *8—9 (4th Cir. Feb. 2, 1994) (unpublished per curiam). The owner of the selling corporation in Ney stood to receive 2% of the annual gross revenue and 50% of the net pre-tax profits from the purchasing corporation; the purchaser operated the same business with the same employees in the same offices as the seller; and, with "one or two exceptions," the seller and purchaser had the same executives. Id. at *7—8. Also, the sale in Ney occurred around the same time the seller became the subject of a $7,000,000.00 IRS levy. Id. at *2. Nevertheless, the Ney court found there was no ownership continuity, and, in turn, no mere continuation claim. Id. at *9 (citation omitted).

The Trustee's characterizations of PH LLC's takeover of the Hospital, if true, would establish that PH LLC did not acquire the Debtor's property in a bona fide transaction. However, Virginia law holds that continuity between the transferor and transferee corporation's "officers, directors, and stockholders"

31

is the "key element" for mere continuation, and at no point has an officer, director, or stockholder of the Debtor held such a status with PH LLC.  This problem with ownership continuity stands in contrast to Kaiser where there was substantial overlap in ownership between the two corporations even though the owners were not identical.  Here, there has never been any ownership overlap between PH LLC and the Debtor.  In further contrast to Kaiser, Jones and Trefzger's guarantees were not aimed at facilitating a transaction between the Debtor and PH LLC. Instead, Jones and Trefzger made themselves personally liable well before PH LLC was established based on their interest in PHI, another entity with ownership separate from that of the Debtor.  It is true that a levy against the Debtor's accounts served as the catalyst for PH LLC's creation, but this does not qualify as a superficial manipulation of ownership because there was no common ownership in the first place.[20]

Akin to ownership continuity, a consensual transaction generally underlies a mere continuation claim because an agreed upon asset sale is what gives rise to a mere continuation, see, e.g., Kaiser, 123 F.3d at 204 (citations omitted) (noting that

---

[20] The court notes that the Kaiser court, in dictum, found its circumstances to be similar to National Carloading Corp. v. Astro Van Lines, 593 F.2d 559 (4th Cir. 1979), because "the old company" in Astro Van Lines "transferred all of its assets . . . to a new company run by the same people" in an effort to avoid legitimate debt.  Kaiser, 123 F.3d. at 208—09.  However, the facts of Astro Van Lines are distinguishable from the present case even if PH LLC was formed to skirt the levy on the Debtor's bank accounts.  Specifically, the two corporations in Astro Van Lines had the same sole stockholder, id. at 564, and as already belabored, the Debtor and PH LLC had different sets of owners.

mere continuation is an exception to the rule against a company that purchases the assets of another company automatically assuming the debts of the selling company); Harris, 243 Va. at 70 (citations omitted) (same). However, the Trustee has consistently argued that PH LLC's assumption of the Hospital's business was hostile and against the Debtor's will. To the extent the parties were working towards a consensual transition agreement, none was realized. Instead, as the Trustee alleges, PH LLC usurped the Hospital and the Debtor's property after the Debtor was locked out of the Hospital. The Debtor did not acquiesce to PH LLC's unlawful actions and vanish through corporate dissolution. According to the Trustee, just the opposite is true. The Debtor endured after being evicted as it requested access to the Hospital, filed a state court action for the recovery of its records and other property, and sent a letter to Jones in January of 2009 requesting the same. Nor can a harmonious transaction be gleaned from the Defendants' version of events. According to the Defendants, PH LLC was created out of necessity after the Debtor absconded from its responsibilities at the Hospital, not out of a meeting of the minds between the two sets of owners. Regardless of which side is more correct, both parties' characterizations show that the Debtor and PH LLC existed in spite of each other, not in tandem.

To be sure, there is a dispute of fact in regard to the management of the Hospital due to contrasting accounts of the

Hospital's fallout.   However, as was the case in <u>Ney</u>, this dispute is not a substitute for the most important factor for mere continuation under Virginia law—continuity of ownership. Given the deficiency with ownership continuity and the antagonistic relationship between the Debtor and PH LLC, the court concludes that summary judgment is warranted for the mere continuation claim.

**b. De Facto Merger**

Courts generally apply four elements[21] to determine if a de facto merger occurred, but, similar to mere continuation, a de facto merger claim will fail if there is no common ownership between the two entities.   See <u>Royal All. Assocs., Inc. v. Branch Ave. Plaza, L.P.</u>, 587 F. Supp. 2d 729, 740 (E.D. Va. 2008) (ruling there was no de facto merger because there was no continuity of ownership); <u>Crawford Harbor Assocs. v. Blake Constr. Co.</u>, 661 F. Supp. 880, 884 (E.D. Va. 1987) ("The most critical element . . . is continuity of ownership.").   In fact, the common ownership requirement may be so strict that it will only be satisfied if the assets are acquired through a stock

---

[21] The four elements are:

(1) a continuity of the selling corporation's enterprise, including continuity of management, personnel, physical location, assets, and general business operations; (2) a continuity of ownership because the purchasing corporation acquires the assets with shares of its own stock, which ultimately are held by the selling corporation's shareholders; (3) prompt liquidation and dissolution of the selling corporation's business operations; and (4) an assumption by the purchasing corporation of the selling corporation's obligations necessary for normal operation of the seller's business.

<u>Blizzard</u>, 831 F. Supp. at 547 (citations omitted).

transfer.  <u>See Ney</u>, 1994 WL 30973, at *7—9, *7 n.3 (citations omitted) (noting that a claim for de facto merger under Virginia law "plainly [did] not apply" even though the transferee corporation operated the same business as the transferor because the transferor acquired no stock from the transferee); [22]

<u>Waterford Inv. Servs., Inc. v. Bosco</u>, No. 3:10cv548-REP, 2011 WL 3820723, at *17 (E.D. Va. July 29, 2011) (ruling there was no claim for de facto merger on the "particular basis" that there was no stock transfer); <u>Blizzard v. Nat'l R.R. Passenger Corp.</u>, 831 F. Supp. 544, 547—49 (E.D. Va. 1993) (ruling there was no de facto merger because there was no sale or transfer of stock, but going on to rule there was enough continuity of ownership for a mere continuation claim to survive summary judgment); <u>Taylor</u>, 808 F. Supp. at 1251 (noting the assets were purchased with cash and no shareholders of the purchaser became shareholders of the seller or vice versa); <u>Crawford Harbor Assocs.</u>, 661 F. Supp. at 884 (" 'The essential characteristic of a de facto merger is the succession of the selling corporation's stockholders to stockholder status in the purchasing corporation.' " (quoting

---

[22] In <u>Acme Boot Co.</u>, the Fourth Circuit noted there was no uniform rule among jurisdictions as to whether all four elements must be present for a finding of de facto merger, and Virginia law was silent on this issue.  1991 WL 39457, at *3.  Subsequently, however, the <u>Ney</u> court reached the conclusion noted above without analyzing any of the other de facto merger elements. 1994 WL 30973, at *7 & n.3.  The <u>Ney</u> court also observed that <u>Acme Boot Co.</u> was not conclusive as to Virginia law due to the procedural posture in that case, noting the <u>Acme Boot Co.</u> court "merely sent the case back for further factual determination in the District Court." <u>Id.</u> at *8 n.5.  In light of <u>Ney</u>'s interpretation of <u>Acme Boot Co.</u>, even though they are unpublished decisions, it appears that common ownership is necessary for a de facto merger claim even if the other elements are guidelines as opposed to requirements under Virginia law.

Robert J. Yamin, <u>The Achilles Heel of the Takeover: Nature and</u>
<u>Scope of Successor Corporation Products Liability in Asset</u>
<u>Acquisitions</u>, 7 HARV. J. L. & PUB. POL'Y 185, 231 (1984))). Here,
the de facto merger claim fails because the Debtor and PH LLC
have different sets of owners and no stock transfer is evidenced
in the record.

**E. Claim for Suretyship Contribution**

**1. Parties' Positions in Regard to the Suretyship Claim**

The Suretyship Defendants argued in the 2010 Motion that
the Debtor was not a surety to PHI. However, at the Motion
Hearing, the Suretyship Defendants' counsel acknowledged that
the Debtor was a surety by virtue of the Debtor hypothecating
its assets in support of the PHI Loan. Yet, counsel for the
Suretyship Defendants still maintained that PHI was not liable
based on principles of equity because the Debtor's alleged
default and abandonment caused the demise of the business
venture with the Hospital.

Continuing with the equity-based argument, the Suretyship
Defendants' counsel argued at the Motion Hearing that the
Individual Guarantors [23] were not cosureties with the Debtor

---

[23] Under Virginia law, a guaranty is distinct from a suretyship in that a
guaranty is understood to be a secondary obligation and a suretyship is
understood to be a primary obligation. <u>Phoenix Ins. Co. v. Lester Bros.,</u>
<u>Inc.</u>, 203 Va. 802, 807, 127 S.E.2d 432 (1962) (citation omitted). " 'The
guarantor contracts to pay, if, by the use of due diligence, the debt cannot
be made out of the principal debtor, while the surety undertakes directly for
the payment, and so is responsible at once if the principal debtor makes
default . . . .' " <u>Id.</u> (quoting <u>Piedmont Guano & Mfg. Co. v. Morris</u>, 86 Va.
941, 944—45, 11 S.E. 883 (1890)). The court refers to the Individual
Guarantors as such because the respective agreements are titled "Guaranty of
Payment and Performance." However, the agreements all purport to give the

because the risk between those parties was not equitably allocated. According to the Suretyship Defendants' counsel, the risk between the parties was not equal because the Individual Guarantors would have still been liable for the debt associated with the PHI Loan if the Debtor had no assets upon PHI's default. On a similar note, counsel for the Suretyship Defendants' also maintained that the Individual Guarantors would not have been entitled to contribution from the Debtor had they paid the balance of the PHI Loan. The Suretyship Defendants' counsel acknowledged that the Debtor ultimately satisfied the outstanding balance on the PHI Loan, but he maintained that the Individual Guarantors were merely fortunate that the Debtor had sufficient assets to satisfy the loan balance. Since the Individual Guarantors argued that they were not liable under a theory of suretyship, they also asserted they were not liable under a theory of subsuretyship as a matter of law.

In response to the Suretyship Defendants' argument, the Trustee espoused three main theories of recovery against PHI and the Individual Guarantors at the Motion Hearing based on the Debtor's hypothecation of its assets for the PHI Loan. First, the Trustee maintained that the equities present in this case established that the Debtor was a subsurety as to the Individual

---

creditor the right to collect against the secondary obligor on the sole basis of the principal debtor's default. Accordingly, the Individual Guarantors are sureties under Virginia law notwithstanding the agreements being titled "Guaranty." See Columbia Realty Venture, LLC v. Dang, 83 Va. Cir. 258, No. CL-2010-12427, 2011 WL 8947415, at *4—5 (Va. Cir. Ct. Aug. 16, 2011) (noting that the secondary obligation was a suretyship despite the agreement being labeled a guaranty).

Guarantors, making them liable for all amounts the Trustee paid
toward the PHI Loan along with PHI.   Second, the Trustee
asserted that the Debtor's estate was released as a surety due
to the Hospital Sale and Bed License Agreement being entered
into without his consent.   In further support of the assertion
that the estate was released, the Trustee alluded to a post-
petition forbearance agreement where the Individual Guarantors
agreed to assist the PHI Loan creditor's efforts to collect
against the Debtor's assets without the Trustee's consent.   See
Deposition of Paul R. Ekholm, no. 11-05023, Doc. No. 28-5 at 24,
28.   According to the Trustee, since the estate was no longer
obligated as a surety by virtue of the release, the estate
became subrogated to the rights of the creditor when the Trustee
paid off the PHI Loan, allowing the Trustee to recover all the
amounts paid from PHI and the Individual Guarantors, jointly and
severally.   Third, as an alternative to the subsurety and
subrogation arguments, the Trustee argued that the Debtor stood
as a cosurety to the Individual Guarantors, making them each
liable for a per capita contribution.

   The Trustee's claim for subsuretyship contribution would be
wholly negated if the Debtor was not entitled to recover from
PHI and the Individual Guarantors as a surety under the PHI Loan,
so the court will first address the Debtor's status as a surety
and cosurety at the time of the PHI Loan.   The court concludes
that the claim that the Debtor was a surety to PHI and the claim

38

that the Debtor was a cosurety to the Individual Guarantors at the time of the PHI Loan should proceed to trial. As to the Trustee's claim based on subsuretyship, it would not be reasonable to conclude that the Debtor was a subsurety at the time of the PHI Loan. At the same time, there is a dispute of material fact as to whether the estate assumed the position of subsurety at the time the Trustee paid off the balance of the PHI Loan. Accordingly, the Trustee's claim for subsuretyship based on subrogation will be allowed to proceed to trial.

## 2. Debtor's Status as Surety

A suretyship is established when a secondary obligor (the surety) agrees to be liable to a creditor in the event of a principal debtor's default.[24] _Courson v. Simpson_, 251 Va. 315, 320, 468 S.E.2d 17 (1996). A suretyship agreement is generally for the benefit of the creditor. _See_ _id._ ("As between the principal debtor and the surety, the ultimate liability rests on the principal debtor, but the creditor has a remedy against both.") (citations omitted). At the same time, the primary debtor is liable to the surety to the extent the surety satisfies the principal debtor's obligation to the creditor. _XL Specialty Ins. Co. v. Commonwealth_, 269 Va. 362, 369—70, 611 S.E.2d 356 (2005) (citations omitted). A suretyship can be

---

[24] A claim for suretyship contribution is a contract claim under North Carolina law. _See_ _New Bern Riverfront Dev., LLC v. Weaver Cooke Constr., LLC_ (_In re New Bern Riverfront Dev., LLC_), 521 B.R. 718, 723 (Bankr. E.D.N.C. 2014) (citation omitted). In accordance with the court's previous discussion regarding choice of law, Virginia law is applicable to the Trustee's claim for suretyship contribution.

created expressly or impliedly. For example, offering
collateral for the debt of another creates a suretyship
notwithstanding the absence of an express agreement. See
Courson, 251 Va. at 317—20 (applying Virginia suretyship law
where parties offered their residence as collateral for the debt
of another entity); RESTATEMENT (THIRD) OF SURETYSHIP AND GUAR.
("RESTATEMENT") § 1, cmt. g (AM. LAW INST. 1995).

The court sees no reason to deviate from the Suretyship
Defendants' concession that the Debtor became a surety as a
result of offering its property to secure the PHI Loan.
Marshall loaned the $2,000,000.00 to PHI, not the Debtor, to
finance the purchase of the Hospital, and the Debtor
hypothecated its assets to Marshall to secure the loan made to
PHI. There may be merit to the argument that the Debtor was the
catalyst of the Hospital's fallout, but the Suretyship
Defendants' contentions in this regard amount to disputes of
material fact that are more fit for trial. Accordingly, summary
judgment is denied with respect to the Suretyship Defendants'
contention that the estate is not entitled to recovery for the
claim that the Debtor stood as a surety to PHI.

### 3. Debtor's Status as Cosurety

Where two or more sureties are liable on the same debt
incurred by the same principal debtor, the sureties are liable
to one another as cosureties—even if the sureties are bound by
different instruments and have no knowledge of each other.

40

Rosenbaum v. Goodman, 78 Va. 121, 127 (1883) (citations omitted); Harrison v. Lane, 32 Va. (5 Leigh) 414, 418 (1834) (opinion of Cabell, J.); Colonial American Nat'l Bank v. Kosnoski, 617 F.2d 1025, 1031 (4th Cir. 1980) (Murnaghan, J., dissenting) (citations omitted).  Generally speaking, a cosurety is presumed to be liable for his per capita share of the underlying debt absent an agreement that provides otherwise, and a cosurety has a claim for contribution against other cosureties to the extent the paying surety tenders more than his respective share.  Houston v. Bain, 170 Va. 378, 389—90, 196 S.E. 657 (1938); RESTATEMENT § 57(1).  " 'The right of one surety to call upon his cosurety for contribution arises from a principle of equity growing out of the relation which the parties have assumed towards each other; the equity springs up at the time of entering into that relation, and is fully consummated when the surety is compelled to pay the debt.' "  Cooper v. Greenberg, 191 Va. 495, 501, 61 S.E.2d 875 (1950) (quoting Houston, 170 Va. at 390).  Although the cosurety relationship is "fully consummated when the surety is compelled to pay the debt," the possibility of a surety's inability to pay does not negate the presence of a cosurety relationship, in and of itself.  See id. at 501, 504 (ruling that a cosurety's insolvency was "not a determinative factor").  To the contrary, other cosureties may still be liable to the surety with the contribution claim notwithstanding the presence of insolvent sureties.  See id. at

504 (affirming that the surety claiming contribution had a one-third right of contribution where one cosurety was solvent and the other remaining cosurety was insolvent).[25]

The Debtor and the Individual Guarantors made a pledge to Marshall to secure PHI's performance under the PHI Loan, so the Debtor and the Individual Guarantors are presumed to be cosureties.  The Individual Guarantors contend that the possibility of insolvency wholly negates the presence of a cosurety relationship, but the law does not support this contention.  As such, the Individual Guarantors' equitable contentions do not entitle them to summary judgment on the Trustee's claim for cosuretyship.

### 4. Debtor's Status as Subsurety at the Time of the PHI Loan

A subsuretyship exists where multiple sureties are liable to a creditor for the same debt, but, in contrast to cosuretyship, one surety ought to bear the entire cost incurred by another surety who covers the principal debtor's default.  Allstate Ins. Co. v. Am. Bankers Ins. Co. of Fla., 882 F.2d 856, 861 (4th Cir. 1989) (citation omitted); RESTATEMENT § 53 cmt. b.  A subsuretyship entails " 'two interlocking tripartite

---

[25] When determining the per capita share for cosurety contribution, Virginia law recognizes a distinction between a recovery under law and a recovery under equity.  Cooper v. Greenberg, 191 Va. 495, 501—04, 61 S.E.2d 875 (1950).  Under both law and equity, the amount of recovery is per capita, but the number of cosureties accounted for in the per capita share of contribution is different.  If a surety is seeking contribution under law, then all of the sureties who were originally liable on the underlying obligation will be counted in determining the per capita share of contribution.  In re Porter, 50 B.R. 510, 516 (Bankr. E.D. Va. 1985).  If the basis for cosurety contribution is equity, insolvent sureties are not accounted for in determining the per capita share, meaning the subsequent insolvency of a cosurety increases the exposure of solvent cosureties.  Id.; RESTATEMENT § 57.

relationships.' "   Allstate Ins., 882 F.2d at 861 (quoting
RESTATEMENT (FIRST) OF SEC. ("RESTATEMENT OF SEC.") § 145 cmt. a (AM. LAW
INST. 1941)).   As between the creditor and the sureties, the
creditor may seek relief against any surety like it could in a
conventional suretyship.   Id. (citation omitted).   As between
the sureties, the surety who should bear the cost of performance
(the principal surety) stands liable for any amounts the other
surety (the subsurety) pays towards the satisfaction of the
underlying principal debt.   Id. (citation omitted). Conversely,
the subsurety owes no duty of contribution to the principal
surety.   See id. at 861—62 (ruling the subsurety had no duty of
contribution to the primary sureties).   Bearing all this in mind,
subsuretyship analysis focuses on the relationship between the
sureties with the presumption being that the sureties are
cosureties unless an agreement or the underlying circumstances
dictate otherwise.   See id. at 861 (" 'Where there are two
sureties, the usual relation is cosuretyship, but by agreement
between them or because of the equities of the situation, one of
them as between themselves, may be liable for the entire loss
caused by the default of the principal and hence not a
cosurety' " (quoting RESTATEMENT OF SEC. § 145 cmt. a)).

While there are relatively few decisions available on the
law of subsuretyship, courts have found the Restatement
illustrative in discerning whether a subsuretyship exists in the
absence of an agreement.   See, e.g., id. at 861; Irish v. Woods,

43

864 N.E.2d 1117, 1121—22 (Ind. Ct. App. 2007); Cook v. Crabtree, 733 S.W.2d 67, 69 (Tenn. 1987).   As the Restatement observes, the presumption of cosuretyship may be overcome when a surety assumes an obligation after another surety has bound itself and one of the following three conditions applies:

> "(i) [the subsequent surety] reasonably believes that the prior [surety] is a principal obligor; (ii) being under no duty to assume a greater obligation, [the subsequent surety] manifests an intent to be bound only as a subsurety; or (iii) [the subsequent surety] otherwise reasonably believes that, as between itself and the prior [surety], the prior [surety] has a duty to perform or bear the cost of performance . . . ."

RESTATEMENT § 53(4)(a).

In addition, a subsuretyship may exist when one surety's obligation is limited to a specific element of the principal debtor's performance and another surety is obligated for the entire performance.   Id. at § 53(c), cmt. i, illus. 7.   As the relevant portion of the Restatement observes, the surety who is liable for a specific part of the principal debtor's performance will be a principal surety, and the surety with the general obligation will be regarded as the subsurety.   Id.

Courts have also observed that the presence or absence of a business interest in the underlying principal obligation has a bearing on whether a subsuretyship exits, with an interested surety being less likely to enjoy protection as a subsurety. See, e.g., Kurzman v. Steir, 12 Mass. App. Ct. 470, 473, 426 N.E.2d 165 (1981) (noting that the "common goal" among the sureties to

44

maintain a relationship between the bank and the primary debtor negated the presence of a subsuretyship); A & P Sheet Metal Co. v. Edward Hansen, Inc., 357 A.2d 37, 42—43 (N.J. Super. Ct. Law Div. 1976) (" 'One surety may have such a business interest in the transaction that he will be the principal surety to another surety.' ") (quoting RESTATEMENT OF SEC. § 146, cmt. b); Cook, 733 S.W.2d at 69—70 (noting that the secondary obligor had no business interest in the primary obligation and was a subsurety); Schinnell v. Doyle, 6 Wash. App. 830, 835, 496 P.2d 566 (1972) (noting that the party claiming cosuretyship benefited from the principal debtor assuming the operation of a golf shop); see also Franco v. Peoples Nat'l Bank of Wash., 39 Wash. App. 381, 391, 693 P.2d 200 (1984) (noting that the "lack of business or ownership interest alone" was not sufficient to entitle a party to relief as a subguarantor).

At the time of the PHI Loan Agreement, the Debtor's circumstances appear to be the opposite of a relationship that would establish a subsuretyship without an agreement.  The Debtor and the Individual Guarantors executed their respective agreements contemporaneously, and they all agreed to be liable for the entire PHI Loan based on the sole contingency of a default under the PHI Loan Agreement.  Perhaps the most telling indication of the Debtor's suretyship status is the nature of the Debtor's pecuniary involvement with the PHI Loan.  From the perspective of the Individual Guarantors, the Debtor's

performance was material to the success of the Hospital venture
because the Debtor was PHI's only tenant at the time of the PHI
Loan.  Similarly, the Debtor's rent was intended to cover PHI's
loan payments as the rent was the greater of $20,000.00 or the
PHI Loan payment amount.  It appears the Debtor also viewed its
performance to be a material part of the Hospital venture as it
agreed that a rent payment default as to PHI would also
constitute a default as to Marshall in the Security Agreement.
The Debtor's sole business consisted of operating the Hospital,
and it would not have had that opportunity without the PHI Loan.
The Debtor's motivation to hypothecate its assets was the same,
in whole or in part, as the Individual Guarantors' motivation to
make themselves personally liable: profit.  Thus, it would be
unreasonable for the Debtor to believe that, as between itself
and the Individual Guarantors, the Individual Guarantors had "a
duty to perform or bear the cost of performance" at the time of
the PHI Loan.

Nevertheless, the Trustee cites the Fourth Circuit's
decision in Allstate Insurance Co. v. American Bankers Insurance
Co. of Florida, 882 F.2d 856, [26] and the United States District

---

[26] Allstate Insurance involved an assignment agreement where two sureties
agreed to be personally liable on a criminal defendant's bond in
consideration for another surety pledging his interest in an annuity "should
forfeiture of that bond occur."  882 F.2d at 858.  The non-hypothecating
sureties in Allstate Insurance signed the bond for the criminal defendant to
appear in court while the hypothecating surety did not.  Id.  The Allstate
Insurance court concluded that the hypothecating party was a subsurety
because the non-hypothecating sureties were directly liable if the bond was
forfeited while the hypothecating party had no direct obligation on the
underlying bond and was only liable to the extent the non-hypothecating
sureties were liable.  See id. at 858, 861–62 (referring to the criminal

Court for the Southern District of New York's decision in United States v. Zhang, 153 F. Supp. 2d 341,[27] in support of determining that the Debtor is a subsurety. The Trustee construes Allstate Insurance and Zhang as standing for the proposition that a surety who hypothecates property should always be considered a subsurety as to a party who makes a personal guaranty. Based on this interpretation of Allstate Insurance and Zhang, the Trustee contends that the Debtor should be treated as a subsurety by virtue of it hypothecating its assets in support of the PHI Loan.

Contrary to the Trustee's assertions, Allstate Insurance does not explicitly state that a surety who hypothecates an asset will be a subsurety to a personal guarantor in all cases. Rather, the Allstate Insurance court looked to the definition of subsuretyship in the Restatement. 882 F.2d at 861. Notably, the Restatement definition[28] discussed by the Allstate Insurance court does not provide that a hypothecating surety will always be a subsurety. Id. Instead, the Restatement looked to whether one surety should bear "the whole duty of performance" as to another surety bound on the same underlying debt, id., an

---

defendant as "Kosko," the sureties who were personally liable on the bond as "appellants," and the hypothecating party as "Deisher.")

[27] Zhang involved two sureties who offered a confession of judgment on their residence as security on a bond for a criminal defendant to appear in court while other sureties offered a personal guaranty. 153 F. Supp. 2d at 344, 346. The Zhang court observed that circumstances before it were similar to Allstate Insurance and found that the hypothecating parties were subsureties. Id. at 346.

[28] The Allstate Insurance court discussed a version of the Restatement that has been superseded by the most recent Restatement. RESTATEMENT at IX. However, the principles cited in the Restatement by the Allstate Insurance court do not appear to be inconsistent with the version of the Restatement relied upon by this court.

approach that suggests a consideration of the totality of the circumstances as opposed to one aspect of a multifaceted transaction. In adopting the Allstate Insurance court's approach to the subsuretyship determination, the Zhang court noted that the Fourth Circuit "reached its conclusion [in Allstate Insurance based on] a thorough analysis of security law," Zhang, 153 F. Supp. 2d at 346, instead of applying a strict per se rule. This court, therefore, is of the opinion that neither Allstate Insurance nor Zhang establish a rule that a hypothecating surety must be deemed a subsurety without consideration other factors relevant to whether a surety should bear the whole duty of performance.

While it may be appropriate to find a subsuretyship in circumstances similar to Allstate Insurance and Zhang, the Debtor, unlike the subsureties in those cases, had a business interest in its suretyship. Moreover, determining that the Debtor was a subsurety at the time of the PHI Loan Agreement purely by the hypothecation of its assets would be repugnant to equity and fairness in light of all the circumstances that show the Debtor had a vested stake in the PHI Loan. The circumstances surrounding the consummation of the PHI Loan Agreement do not mandate that the Individual Guarantors bear the cost of performance given the Debtor's involvement with the Hospital venture, and the court rules that it would be unreasonable to hold that the Debtor was a subsurety at the time

of the PHI Loan.  Consequently, the Individual Guarantors are entitled to summary judgment on the Trustee's claim for subsuretyship at the time of the PHI Loan.

## 5. Debtor's Suretyship Status under a Theory of Release and Subrogation

Under Virginia law, a surety that satisfies the obligation of a principal debtor is generally subrogated to all of the rights and remedies of the creditor for the amounts paid in satisfaction of the debt.  In re Worley, 251 F. Supp. 725, 727 (W.D. Va. 1966) (citations omitted).  At the same time, while a creditor may recover the entire debt against one of multiple sureties, a subrogated surety may not enjoy the same flexibility. Specifically, the surety's ability to recover more than its per capita share against other cosureties through subrogation is measured by the claimant's suretyship status at the time the surety became subrogated to the rights of the creditor.  See Goosman v. Harris, No. 91-0426-R, slip op. at 3 (W.D. Va. Dec. 24, 1991) (noting that allowing a cosurety subrogated to the rights of the creditor to claim more than his per capita share against a cosurety "would result in an unending circle of litigation among co-sureties"); RESTATEMENT § 28(2)(b). Accordingly, a subrogated subsurety may recover the entire amount paid from any primary surety, but a subrogated cosurety may only recover the respective per capita share from other cosureties.

Here, both sides agree that the Trustee paid off the balance of the PHI Loan, and it appears the estate is subrogated to the rights of the PHI Loan creditor as a result. Since the Debtor was not a subsurety at the time of the PHI Loan, the Trustee will need to establish that the Debtor's estate subsequently assumed the role of a subsurety if the Trustee is to recover all of the amounts paid to satisfy the PHI Loan. As will be discussed, the Trustee's allegations regarding whether the estate was released prior to the satisfaction of the PHI Loan creates a dispute of material fact about his claim for subsuretyship under a theory of subrogation.

Although a suretyship is generally understood to protect the rights of the creditor, a surety may be released if the underlying obligation is altered without the surety's consent. Bd. of Supervisors v. S. Cross Coal Corp., 238 Va. 91, 94, 380 S.E.2d 636 (1989). Similarly, a non-consenting surety will be released to the extent the creditor releases collateral without a corresponding decrease in the underlying obligation. First Am. Title Ins. Co. v. First All. Title, Inc., 718 F. Supp. 2d 669, 675—76 (E.D. Va. 2010) (citing Conner v. West, 129 Va. 85, 96 (1921)). At the same time, a surety may waive its right to a release through the terms of an agreement. Centex Constr. v. ACSTAR Ins. Co., 448 F. Supp. 2d 697, 713 (E.D. Va. 2006) (citation omitted).

In addition, a surety's status as an accommodation[29] or a compensated surety has bearing on the release of the surety.[30] A non-consenting accommodation surety will be discharged by any alteration of the underlying obligation while a non-consenting compensated surety will only be discharged to the extent the change is material.[31] S. Cross Coal Corp., 238 Va. at 94—95 (citation omitted). Furthermore, when a term in an agreement is subject to more than one reasonable interpretation, the term should be construed in favor of the creditor if the surety is a

---

[29] Accommodation sureties are also referred to as gratuitous sureties. See Dang, 2011 WL 8947415, at *3 (noting a decision from the Supreme Court of Virginia "described the obligation of a gratuitous, or accommodation surety").

[30] An accommodation surety is " 'bound by his agreement alone' " and derives " 'no benefit from the transaction' " while a compensated surety acts " 'not to accommodate others, but to promote [his] own interests.' " Southwood Builders, Inc. v. Peerless Ins. Co., 235 Va. 164, 168—69, 366 S.E.2d 104 (1988) (emphasis omitted) (quoting Kirschbaum v. Blair, 98 Va. 35, 40, 34 S.E. 895 (1900)). The paradigm example of a compensated surety is an entity that sells its credit for "a stipulated price, and in equity should be on the same footing as a merchant who sells his goods on credit for a price that pays him a profit." S. Sur. Co. v. Plott, 28 F.2d 698, 700 (4th Cir. 1928). At the same time, incidental benefits received by a surety may not be sufficient for the surety to be treated as a compensated surety. See Gibson Equip. Co. v. AGM Dev. Corp., 54 Va. Cir. 474, No. L99-2893, 2001 WL 1262340, at *3 (Va. Cir. Ct. Feb. 7, 2001) (ruling that a surety was not a compensated surety because "[h]e did not benefit from the transaction at issue" notwithstanding the fact the surety had owned stock in the principal debtor's company that was controlled by the surety's son).

[31] It does not appear that a surety's status as a gratuitous or a compensated surety under Virginia law has the same bearing on the extent of a surety's release when collateral is relinquished that it does with a modification to the underlying agreement. Specifically, a non-consenting surety will only be released to the extent that the underlying debt is not forgiven in proportion with the value of the released collateral, regardless of whether the surety is gratuitous or compensated. For example, in a case involving an "accommodation endorser," the Supreme Court of Virginia noted that " 'a surety is discharged, at least to the extent of the value of the security lost, where the creditor, without the surety's consent, affirmatively releases collateral security.' " Ward v. Bank of Pocahontas, 167 Va. 169, 175—76, 178—79, 187 S.E. 491 (1936) (quoting 21 RULING CASE LAW 1055 (William M. McKinney & Burdett A. Rich eds., 1918)); cf. First Am. Title Ins. Co. v. First All. Title, Inc., 718 F. Supp. 2d 669, 676 (E.D. Va. 2010) (noting that a non-consenting surety will be released " 'in toto' " if there is " 'an absolute release of the debt,' " but a non-consenting surety will only be released " 'pro tanto' " if collateral is released (quoting Conner v. West, 129 Va. 85, 96, 105 S.E. 762 (1921))); RESTATEMENT § 42, cmt. a, cmt. d, cmt. g.

compensated surety.   Century Indem. Co. v. Esso Standard Oil Co.,
195 Va. 502, 512, 79 S.E.2d 625 (1954) (citations omitted).

The Trustee alleges that the Hospital Sale as well as the
Bed License Agreement altered the parties' relationship without
the Trustee's consent, and, as a result, the estate was released
from its obligation to the PHI Loan creditor.   The Suretyship
Defendants deny that they are responsible for any resulting
derogation of the estate's rights due to the lack of notice to
the Trustee.   However, the Suretyship Defendants have not argued
that there was no material change in the agreement, and they
have not pointed to any language in the relevant documents
providing for a waiver of the Debtor's right to a release. [32]
Moreover, the Debtor's status as an accommodation or compensated
surety is relevant to whether the estate was released from
liability under the Security Agreement, and this issue has
received no attention from the parties.   For all of these
reasons, there is a dispute of material fact in regard to
whether the estate was released from its obligation as a surety.
In light of this dispute of material fact, the court could
logically conclude the estate took the position of a subsurety

---

[32]  At the Motion Hearing, counsel for the Suretyship Defendants argued that
the Trustee should be suing Marshall instead of PHI and the Individual
Guarantors for being kept in the dark in regard to the Hospital Sale and Bed
License Agreement.   This argument would be more persuasive if the Suretyship
Defendants were also alleging that they were completely released by the PHI
Loan creditor since the Trustee's subrogation rights are dependent on the
rights of the creditor of the PHI Loan.   However, as far as the court can
tell, the Suretyship Defendants were never released, so their liability still
stands either to the PHI Loan creditor or another party subrogated to the
rights of the PHI Loan creditor.

when the Trustee satisfied the PHI Loan because (i) the estate
would have assumed an obligation when it had no duty to do so
and (ii) the Trustee likely would have manifested the intent to
be bound only as a subsurety.  Essentially, even if the Debtor
was merely a cosurety at the time of the PHI Loan, the estate
could have reasonably assumed subsurety status when the Trustee
satisfied the PHI Loan without knowledge of the Hospital Sale or
Bed License Agreement.  Accordingly, summary judgment is denied
as to whether the estate assumed subsurety status under a theory
of subrogation when the Trustee paid off the PHI Loan.

**V. Claims Conceded or Not Contested**

The Defendants did not mention the Trustee's claims under
§ 506(c) and § 510 in the Motions or at the Motion Hearing.  To
the extent the Defendants are seeking summary judgment for these
claims, it is denied because the Defendants have not met their
burden of showing why summary judgment is appropriate.  The
Defendants conceded at the Motion Hearing that the claims for
accounting and unjust enrichment were not appropriate for
summary judgment, so summary judgment is denied with respect to
those claims as well.

**VI. Conclusion**

Based on the foregoing, the request for summary judgment in
regard to:

(1) the claims under §§ 544, 548, and 549 is **GRANTED;**

(2) the claim under § 547 is **DENIED;**

(3) the claim under § 550 is **GRANTED** to the extent it is based on claims under §§ 544, 548, and 549, and **DENIED** to the extent it is based on the claim under § 547;

(4) the claims for obstruction of justice, the NC UFTA, and N.C. GEN. STAT. § 75 is **GRANTED**;

(5) the Breach of Duty Claims is **DENIED**;

(6) the successor in interest claims is **GRANTED**;

(7) the claim for suretyship contribution is **GRANTED** to the extent the Trustee is claiming that the Debtor was a subsurety at the time of the PHI Loan, but it is **DENIED** as to the Trustee's claim for contribution as a surety or cosurety and the claim for subrogation as a subsurety;

(8) the claims under §§ 506(c) and 510 and the claims for accounting and unjust enrichment are **DENIED.**

The Court will conduct a pre-trial conference in these adversary proceedings at 10:30 a.m. on January 6, 2017 at the United States Courthouse, 200 West Broad Street, Statesville, North Carolina 28677.

**SO ORDERED.**

This Order has been signed                    United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.